[Sac. No. 4245. In Bank.—July 31, 1930.]

SAN FRANCISCO–OAKLAND TERMINAL RAILWAYS (a Corporation), Respondent, v. CHARLES G. JOHNSON, as Treasurer of the State of California, Appellant.

[Sac. Nos. 4246, 4247, 4248, 4249. In Bank.—July 31, 1930.]

KEY SYSTEM TRANSIT COMPANY (a Corporation), Respondent, v. CHARLES G. JOHNSON, as Treasurer of the State of California, Appellant.

U. S. Webb, Attorney-General, and Frank L. Guerena and H. H. Linney, Deputies Attorney-General, for Appellant.

Brobeck, Phleger & Harrison for Respondents,

CURTIS, J.—The first four of the above-entitled actions were consolidated by agreement for the purpose of trial. The fifth of said actions was by stipulation submitted to the trial court on the record established at the trial of the consolidated actions. While a separate transcript in each action has been prepared and filed in this court under the alternative method, the briefs and arguments of counsel have been addressed to the actions as a group.

These actions were instituted to recover taxes levied upon certain gross receipts of the plaintiff during the years 1921 to 1925, inclusive, and paid under protest. They involve the same grounds of protest, except as to one item of gross receipts which is peculiar to the year 1925, and which will later be given separate consideration. During the later years under discussion the business involved in these actions was operated by the Key System Transit Company, a corporation, and in the earlier years the same business was carried on in the same way by its predecessor, the San Francisco-Oakland Terminal Railways, a corporation, and by a reorganization committee of that company. The change in control, however, had no effect on the management and operation of the business. It will be noted that the Key System Transit Company is the plaintiff in four of these actions, and its predecessor in interest, the San Francisco-Oakland Terminal Railways, is the plaintiff in the other of said actions. For convenience we will refer to these companies as the plaintiff.

Plaintiff, during all of the time covered by the five cases, was an electric railway company engaged in the transportation of persons between San Francisco and East Bay points in Alameda County. As such it was subject to state taxation under section 14, article XIII of the state Constitution, in an amount levied as of the first Monday in March of each year, based upon the gross receipts from the operation, during the preceding calendar year, of all property exclusively used by the company in its railway business. A tax was levied annually during each of the years covered by the five suits. In making each payment the plaintiff complained of the inclusion of certain receipts in the calculation by the state board of equalization of the aggregate gross receipts from plaintiff's operative property upon

which the taxes were computed, and paid a portion of each tax under protest.

It was plaintiff's contention then, as well as now, that certain property was improperly classified by the state board of equalization as property devoted exclusively to railway use, and that the gross earnings of that certain property should not have been included in the tax base.

The property of plaintiff alleged by it to have been non-operative in character, or otherwise expressed, not exclusively used by plaintiff in its railway business, is (1) the ferry-boats of the plaintiff plying between the Key Route pier on the east side of San Francisco Bay and the city of San Francisco; (2) the commissary and news-stand in the Ferry Building in San Francisco, at Adeline Street and Alcatraz Avenue in Oakland, and in the Key Route Inn at Oakland, and (3) store space at University and Shattuck Avenues in the city of Berkeley, at Twenty-second and Broadway (the Key Route Inn) in the city of Oakland, and in the Ferry Building, San Francisco.

The question to be submitted in each case is whether the property above enumerated was properly classified by the state board of equalization as operative property.

If the classification made by the board was proper, then the entire tax levied during each of the five years (1922 to 1926, inclusive) was legally payable and plaintiff has no cause of action against the state.

If the board erred in the classification, and all of the property above enumerated was nonoperative property, then it was not taxable by the state, and plaintiff would be entitled to judgment for the recovery of so much of its taxes as were paid under protest.

If the board erred in its classification of less than all of the items of property in dispute, then plaintiff would be entitled to judgment only for so much of the amount sued for as the gross earnings of the improperly classified property contributed to the total tax levied by the state board.

Before passing to the discussion of the real points in controversy, it might be well to further set out in detail a more complete description of plaintiff's property, the manner of its operation, and the different uses to which it was being put by the plaintiff. As before noted, the plaintiff, during the years mentioned above, has been engaged in the business

of transporting passengers between the cities of Oakland, Berkeley and Piedmont, sometimes referred to as the East Bay district, and the city of San Francisco, by means of suburban trains, operated by electric power, and a line of ferry-boats across the bay of San Francisco. Passengers traveling from the East Bay district to San Francisco board the suburban trains of plaintiff and are conveyed in said trains to the Oakland pier, located on the easterly shore of said bay. At the Oakland pier said passengers board plaintiff's ferry-boats and are conveyed thereon to the Ferry Building in San Francisco. Passengers from San Francisco to the East Bay district simply reverse the above order of travel. All of them, however, use plaintiff's ferry-boats and suburban trains in reaching their destination. These passengers pay a single fare for the entire trip, both rail and water. Plaintiff has for a long period of years assigned one-half of this fare to the "water haul" and one-half to the "rail haul." The state board of equalization, however, in calculating plaintiff's gross receipts for the purpose of fixing the amount of taxes due the state, has included the whole of said fare as receipts by plaintiff from its operative property. It is plaintiff's contention that the one-half of said fare assigned by it to the "water haul" is no part of its receipts from its operative property and should not have been included by the state board of equalization in calculating the amount of the gross receipts of plaintiff for taxation purposes.

Besides these suburban passengers using both the railroad and ferry-boats of the plaintiff, there is a second class of passengers who do not use plaintiff's trains at all in reaching or departing from the Oakland pier, but who are carried by the San Francisco-Sacramento Railway Company, generally referred to as the "Sacramento Short-Line," which railroad runs from the Oakland pier to Sacramento and other eastern points. This line is operated entirely by the latter company. By an agreement with the plaintiff the Sacramento Short-Line operates its trains from Shafter and Fortieth Streets, in the city of Oakland, to the Oakland pier, a distance of about seven miles, over the tracks of the plaintiff's interurban railroad between said two last-named points. All passengers of this class to and from San Francisco use plaintiff's ferry-boats, and travel over the tracks

of plaintiff's interurban railroad on the trains of the Sacramento Short-Line. Plaintiff received for carrying such passengers, during the period of time covered by these actions, the sum of eighteen cents per passenger, the same amount as was charged as fare to its regular suburban passengers. The receipts of the plaintiff from the Sacramento Short-Line passengers as well as for freight hauled over said lines were apportioned by plaintiff in equal shares between the ferry haul and the rental of plaintiff's tracks. The amount received for rental is not here involved. What is involved is the amount received during the several years in question for the carriage upon its ferry-boats of the Short-Line passengers and freight.

There is a third class of passengers who make use of plaintiff's boats in traveling to and from Goat Island and San Francisco. Goat Island, or, to speak correctly, Yerba Buena Island, is situated in San Francisco Bay, and is not far distant from the Oakland pier of the Key System Transit Company. These passengers make no use of the rail lines of plaintiff, but in traveling to and from Goat Island are conveyed in boats not operated by plaintiff. No tax has been paid on fares collected from them, but the circumstances surrounding this traffic are of importance, according to plaintiff's contention, as bearing upon the question as to whether the ferry-boats of the plaintiff are used exclusively for railroad purposes.

There is also a fourth class of passengers using plaintiff's ferry-boats, referred to in the briefs of counsel as "pier to pier" passengers. These passengers board plaintiff's boats at the Ferry Building at San Francisco and travel thereon to the Oakland pier and return to San Francisco in the same way on plaintiff's ferry-boats. The number of these passengers appears to be so insignificant that no special rate was fixed for them, nor was any account kept of the amount received as fares paid by them. No tax has been paid on such fares, and the only importance attached to this evidence by the plaintiff bears upon the contention that the ferry-boats were not used exclusively for railroad purposes.

Plaintiff also maintained what it chose to call "commissaries" on its boats and also in its waiting-rooms at the Ferry Building in San Francisco, in the Key Route Inn in Oakland, and at its Alcatraz junction in Oakland. In the

commissaries maintained by the plaintiff on its boats it operated restaurants, bootblack stands and news-stands. Those maintained at its waiting-rooms were confined to news-stands at which were sold papers, magazines, candies, chewing gum, etc. On May 1, 1925, the plaintiff sold all of said commissaries, together with all furniture and equipment thereof, to the Key System Service Company, a corporation, and since said date said last-named corporation has operated said commissaries exclusively, and the plaintiff has received nothing directly from the operation of this business. However, it appears from the evidence that the Key System Service Company had been organized in March, 1925, and that all of its stock was issued to plaintiff in exchange for the property transferred.

In addition to the commissary service on its boats, already described, the plaintiff company at all times prior to May 1, 1925, maintained three news-stands, one at the Ferry Building at San Francisco, another at the Key Route Inn at Oakland, and the third at Adeline Street and Alcatraz Avenue in Oakland. These news-stands were all located in waiting-rooms maintained by the plaintiff, but they were accessible to and were patronized by the general public as well as by patrons of the plaintiff. The entire gross receipts therefrom were treated by the state board of equalization as one of the elements of gross receipts of the plaintiff from the operation of its railroad business, and the taxes levied thereon constitute one of the items involved in these actions. On May 1, 1925, these news-stands were acquired by the Key System Service Company in the same manner that the company acquired the commissaries on plaintiff's boats, and ever since that date have been operated by the Key System Service Company.

The only other item over which there is any dispute relates to receipts from rental of space in the Ferry Building at San Francisco to the owners of a candy-store; of space at Twenty-second Street and Broadway (the Key Route Inn) in Oakland for telephone booths, and of a store-room at University and Shattuck Avenues in Berkeley. In each of these three cases the plaintiff holds the lease of the premises, and the receipts for rent are from tenants occupying the premises under subleases from the plaintiff. Appellant practically concedes that the rentals so received by the

plaintiff from its premises at Oakland and Berkeley were improperly included in the amount of its gross receipts, but makes no such concession regarding the rental of space in the Ferry Building, and contends that the latter rental stands in the same class with receipts from the commissary maintained by plaintiff in its waiting-room at the Ferry Building.

The principal item of dispute involved in these five actions concerns the receipts of plaintiff from its regular passengers using its ferry-boats between the Oakland pier and the Ferry Building in San Francisco. As we have seen, plaintiff apportioned these receipts equally between its strictly railroad system and its line of ferry-boats, or as stated above, between its "rail haul" and its "water haul." It makes no claim but that the one-half of these receipts apportioned to its "rail haul" was properly included by the board of equalization for state taxation purposes, but it vigorously contends that one-half of said receipts apportioned to its "water haul," or ferry-boat system, was erroneously so included.

It bases this contention upon the fact that its ferry-boats, in addition to being used to carry its own regular passengers, are also used for the purpose of transporting (1) passengers from the Sacramento Short-Line, (2) passengers from Goat Island, and (3) "pier to pier" passengers who travel only between the Oakland pier and San Francisco and who make no use of any railroad.

We will first consider the use by plaintiff of its ferry-boats for the carriage of the passengers of the Sacramento Short-Line. Plaintiff contends that this use of its ferry system renders its ferry-boats nonoperative property and not subject to taxation for state purposes, in that while they are used for hauling its own passengers, they are also used for hauling passengers received from an entirely different and independent company, the Sacramento Short-Line. Hence, plaintiff contends that its ferry-boats are not used exclusively in the operation of its own railroad business as required by section 14 of article XIII of the state Constitution.

We think there is no merit in the contention. While the Sacramento Short-Line did not use the cars of the plaintiff in reaching or leaving Oakland pier, this company did use

the tracks of the plaintiff's railroad in hauling its cars to and from said pier. The only difference between these passengers and plaintiff's regular passengers was that the former did not use plaintiff's cars while the latter did. The passengers from the Sacramento Short-Line traveled over precisely the same route used by plaintiff in carrying a part of plaintiff's regular passengers. Each of these two classes of passengers used plaintiff's railroad for the purpose of reaching and leaving the ferry-boats, one in plaintiff's cars, the other in cars of an independent company operating over plaintiff's tracks. In transporting passengers of the Sacramento Short-Line by boat, plaintiff was using its ferry-boats in the operation of its railroad business practically in the same manner as when transporting passengers from its own railroad.

While plaintiff has not conceded, it has not seriously questioned, the claim of the appellant that if its ferry-boats were used exclusively in carriage of passengers to and from its own railroad line, such ferry-boats would form a part of its railroad system and would accordingly be subject to taxes for state purposes. While section 14 of article XIII of the Constitution does not mention ferry-boats, it does give to the legislature power to pass all "laws necessary to carry this section into effect." The legislature, acting upon the authority and power thus conferred, has, among other enactments, passed section 3665b of the Political Code which provides, among other things, that "the term 'operative' property as used in any section of this code shall include, in the case of railroad companies, . . . ferry boats, tugs and car floats used exclusively in the operation of railroad business." Plaintiff has not attacked the constitutionality of this code section, nor advanced any argument, nor cited any authority, to the effect that its enactment was not strictly in accordance with the power conferred upon the legislature by the Constitution. It has confined its argument almost in its entirety in support of its claim that plaintiff's boats were not used exclusively in the operation of its railroad business. In so far as this argument has been directed to the use by plaintiff of its boats for the carriage of the so-called Short-Line passengers, we are of the opinion that it is unsound for the reason, as already stated, that these passengers occupy practically the same status as

plaintiff's regular passengers and that by the use of plaintiff's ferry-boats for their carriage plaintiff is using its ferry system in the operation of its railroad business.

We will now pass to the discussion of the use of plaintiff's ferry-boats by the Goat Island and "pier to pier" passengers. These passengers admittedly do not use plaintiff's railroad for the purpose of reaching plaintiff's ferry-boats or upon leaving them. There is no evidence as to the number of the so-called "pier to pier" passengers. Evidently no record was kept of this item of plaintiff's business. The representative of plaintiff when pressed for an answer stated that less than one per cent of the passengers were of this class. This, of course, proves nothing. There might be no more than a dozen or even only one such passengers a year, and still the above answer would be truthful. We will, therefore, dismiss this class of passengers from further discussion. As to the Goat Island passengers, a record was kept which showed that on an average 50,000 fares annually were sold to this class of passengers during the five-year period covered by these actions. While this number standing by itself appears large, yet when compared with the total number of passengers carried by plaintiff during the same period of time, it is not so formidable. Leaving out of consideration the Short-Line passengers, which amounted to about 250,000 passengers each year, plaintiff carried an average, during said five-year period, of over ten million regular passengers per annum. The proportion of Goat Island passengers to these regular passengers was less than one-half of one per cent. It, therefore, appears that over ninety-nine and one-half per cent of the use to which plaintiff's ferry-boats were put was in the operation of its railroad business, and less than one-half of one per cent of said use was not strictly of that character.

Under these circumstances can it be said that plaintiff's ferry-boats were not used exclusively in the operation of its railroad business? In support of an affirmative answer to this question, plaintiff relies on the case of *Lake Tahoe Ry. & Transp. Co.* v. *Roberts,* 168 Cal. 551 [Ann. Cas. 1916E, 1196, 143 Pac. 786]. In that case the plaintiff therein owned a railroad running from the town of Truckee to the town of Tahoe, situated on Lake Tahoe, in this state. At Truckee its railroad connected with the Southern Pacific

Railroad. It also owned four steamers which it operated on Lake Tahoe. It had a traffic agreement with the Southern Pacific Company by which rail passengers of the latter company might be conveyed on the railroad of said plaintiff and on its steamers to designated points on Lake Tahoe in either California or Nevada. In addition to carrying these rail passengers on its steamers, the Lake Tahoe Railway and Transportation Company carried goods and passengers in said steamers between different points on the lake situated in both Nevada and California. Forty-five per cent of the gross receipts from the operation of its steamers was obtained from this purely local traffic. In the winter months the railroad entirely suspended operations, but the steamers continued in business, carrying passengers, freight and express. The state board of equalization classified the steamers as operative property and sought to subject them to a tax upon their entire gross receipts for state purposes. It was held by this court that said steamboats were not used exclusively by the Lake Tahoe Railway and Transportation Company in its railroad business and, therefore, were not subject to taxation for state purposes. We think the facts in the Lake Tahoe case are materially different from those in the present actions. There the local business comprised forty-five per cent of the entire business transacted by the Lake Tahoe Railway and Transportation Company by means of its steamers, and formed a substantial and material part of its business and income. Here the passengers from Goat Island, as we have already seen, represented less in number than one-half of one per cent of the whole number of passengers carried by plaintiff on its ferry-boats, and as compared with the total number of passengers using plaintiff's boats were but a small and insignificant proportion of plaintiff's entire ferry business. With this diversity of facts in the two cases, we are not prepared to accept the Lake Tahoe case as a final determination of the questions involved in the present actions.

We think plaintiff places too great a reliance upon the Lake Tahoe case in support of its contentions herein. That case must be read in the light of the facts then before the court, and it was never intended by this court in its decision therein to settle all questions which might arise in the future as to the status of property primarily. used as opera-

tive property, but which was also used incidentally for other purposes. This court had occasion to express its views upon the scope of the decision in the Lake Tahoe case in the case of *Great Western Power Co.* v. *City of Oakland*, 189 Cal. 649 [209 Pac. 553, 555], wherein, on page 655 of its opinion, are to be found the following statements: "The question as to whether or not the said steam-heating plant of the plaintiff, used as it is alleged to be, primarily for the generation, transmission and sale of electricity and after which use the steam heat thereby developed being thereafter sold and distributed as a by-product, is to be classed as operative or nonoperative property within the intent and meaning of the state Constitution, is an interesting inquiry and is one not altogether covered or concluded by the previous decisions of this court in the cases of *Lake Tahoe Ry. Co.* v. *Roberts*, 168 Cal. 551 [Ann. Cas. 1916E, 1196, 143 Pac. 786], and *Southern Pac. Co.* v. *Richardson*, 181 Cal. 280 [184 Pac. 3]."

■ This court has also held that it will not be governed by any narrow rules of interpretation in construing the above section of the Constitution, but, on the other hand, will give to that section a broad and liberal construction in deciding "questions relating to property which the state claims the exclusive right to tax." In *San Bernardino* v. *State Board of Equalization*, 172 Cal. 76, this court said, on page 78 of its opinion [155 Pac. 458, 460]: "The words relieving public service and certain other corporations from the local taxation must be given fair and reasonable interpretation 'without any definite leaning to the side of the taxing power.' This court has followed the liberal interpretation given by the Supreme Court of the United States to the federal Workmen's Compensation Act in classifying instrumentalities which are used in interstate commerce. A similarly broad and reasonable policy should be followed in deciding questions relating to property which the state claims the exclusive right to tax. The prime requisite for property properly classified as 'operative' is that it shall be used in the conduct of the business of one of the corporations enumerated in subdivision (a) of section 14 of article XIII of the Constitution. (*Lake Tahoe Ry. etc. Co.* v. *Roberts*, 168 Cal. 553 [Ann. Cas. 1916E, 1196, 143 Pac. 786].)" The case of *San Bernardino* v. *State Board of*

*Equalization, supra,* was not only decided subsequent to the decision in the Lake Tahoe case, but, as will be noted, the court relied upon the Lake Tahoe case in support of its conclusion reached in the latter case.

In the light of these recent decisions, we are of the opinion that it would not conform to the policy therein announced by the court to hold that the exceedingly limited use to which plaintiff's ferry-boats are put in the carriage of the few Goat Island passengers should determine and fix this class of property as nonoperative property and not subject to taxation for state purposes. We are fully persuaded that it never was the intent of the framers of this constitutional amendment, nor of the people when they adopted it, to enact a law by the terms of which a line of ferry-boats that devoted its entire service to the transportation of its railroad passengers should be classed as operative property and accordingly subject to taxation for state purposes while another system of ferry-boats, devoted to precisely the same use as the first, except that an occasional nonrailroad passenger might travel thereon, would be held to be property taxable exclusively for local purposes. One of the fundamental and basic principles of taxation is that a tax to be valid should be equal in its burdens and uniform in its operation. (*County of El Dorado* v. *Meiss,* 100 Cal. 268 [34 Pac. 716]; *San Benito Co.* v. *Southern Pac. R. R. Co.,* 77 Cal. 518 [19 Pac. 827].) The construction which the plaintiff asks us to place upon this section of the Constitution would be in direct conflict with this salutary and just rule.

For the reasons herein expressed the ferry-boats of the plaintiff must be held to be a necessary and constituent part of plaintiff's railroad system and, therefore, they were correctly classified by the board of equalization as operative property subject to taxation for state purposes.

We are not without precedent in refusing to give to the term "used exclusively" the narrow interpretation insisted upon by plaintiff. Other courts, when confronted with the problem of determining the meaning of this term, have declared that the term should be reasonably construed, having in mind the object of the provision, and in furtherance of its underlying intent. This is well illustrated in those cases in which tax exemption was sought for property used

for religious, educational or charitable purposes. In our discussion we will limit ourselves to those cases in which the constitutional or statutory provisions require that the property involved shall be "used exclusively" for the particular purpose by virtue of which exemption is claimed.

In *Shaarai Berocho* v. *Mayor etc. of City of New York,* 60 N. Y. Super. Ct. 479, 18 N. Y. Supp. 792, the court held that a Jewish synagogue was used exclusively for purposes of public worship, so as to be exempt from taxation, though the janitor with his wife and grandchild had living quarters on the top floor of the synagogue. In so holding the court said: "The object of the statute was to foster incorporated religious societies, and it must be reasonably construed, according to its spirit, in furtherance of the legislative intent. It cannot be frustrated by a technicality so finely drawn as that urged against the plaintiff's right to exemption. Effect must be given to the principal thing the legislature had in view—the policy that dictated the act. These should not be subordinated to mere incidents required to give it efficacy and life. The former control; the latter follow."

In *First Unitarian Soc.* v. *Hartford,* 66 Conn. 368 [34 Atl. 89], under a statute exempting from taxation, "buildings exclusively occupied as churches" a building owned by a religious society and regularly used for its religious services was held to be exempt from taxation, although the building was available for hire and was rented for entertainments which consisted of lectures, concerts, mesmeric performances, dramas by amateurs and, at times, political conventions.

In interpreting these terms in constitutional or statutory provisions by which exemption is granted to property "used exclusively" for educational purposes, the same broad interpretation has been given by the courts as that given under the "religious purpose" exemption. Thus, in *Kansas Wesleyan University of Salina* v. *Board of Commrs. of Saline County,* 120 Kan. 496 [243 Pac. 1055], under a constitutional provision of Kansas which granted exemption from taxation to property "used exclusively . . . for . . . educational . . . purposes," a nine-room home across the street from the campus, occupied by the president of the school and his family, was declared to be exempt. In *State ex rel.*

152

*Spillers* v. *Johnston,* 214 Mo. 656 [21 L. R. A. (N. S.) 171, 113 S. W. 1083], it was held that a building used as a private military boarding-school was not deprived of its exemption from taxation under a constitutional provision that "lots . . . with the buildings thereon, when the same are used exclusively for . . . schools . . . shall be exempted from taxation . . . " by reason of the fact that the building was also occupied by the proprietor and his family. The court tersely stated the problem and the conclusion thus: "The contention of the state hinges on the phrase 'used exclusively,' found in the tax-exempting clause of the Constitution and statute; and the point for decision is narrowed down to a simple question, which may be stated bluntly and singly to be: If the proprietor of a private military boarding school in Missouri reside in the school building with his family, having no avocation but running the school, and in which avocation the family participate, does such residence destroy the exemption? It is our opinion that, viewed from the philosophy of the thing and measured by cardinal standards of legal interpretation, the right answer is, No."

To the same effect was the decision of the Supreme Court of Illinois in the case of *People ex rel. Pearsall* v. *Catholic Bishop of Chicago,* 311 Ill. 11 [142 N. E. 520]. In that case it was held that the property of a Catholic seminary preparing young men for the priesthood was exempt from taxation under constitutional and statutory provisions exempting property used exclusively for "school or religious purposes." It was held to come within the exemption despite the fact that 140 acres of the grounds consisted of a lake which had been dredged and which was used for swimming, boating and skating, that several acres constituted a baseball diamond and tennis courts, and that 80 acres was intended as a golf course.

The following cases are to the same effect: *Dunne* v. *Rock Island County,* 283 Ill. 628 [119 N. E. 591]; *Sisters of Third Order of St. Francis* v. *Board of Review of Peoria County,* 231 Ill. 317 [83 N. E. 272]; *Board of Commrs. of Tulsa County* v. *Sisters of the Sorrowful Mother,* 141 Okl. 32 [283 Pac. 984]; *Salt Lake Lodge No. 85, B. P. O. E.,* v. *Groesbeck,* 40 Utah, 1 [Ann. Cas. 1914C, 940, 120 Pac. 192]; *Horton* v. *Colorado Springs Masonic Bldg. Soc.,* 64 Colo.

529 [173 Pac. 61]; *In re Syracuse Y. M. C. A.,* 126 Misc. Rep. 431 [213 N. Y. Supp. 35].

We will now pass to the other classes of property which the state board of equalization classified as operative property and which the plaintiff contends was erroneously classified as such. In this class of property are the commissaries maintained and conducted by the plaintiff on its ferry-boats prior to May 1, 1925. Plaintiff has made the same argument regarding these commissaries as it made against the classification of its ferry-boats as operative property; that is, that the commissaries were not used exclusively in its railroad business in that they were patronized by the Sacramento Short-Line, the Goat Island, and the so-called "pier to pier" passengers. What we have already said upon this subject we think is a sufficient answer to plaintiff's claim regarding these commissaries.

Plaintiff, however, makes the further contention that these receipts from the commissaries on its ferry-boats cannot be taxed for the reason that the tax on gross receipts, as provided by the Constitution, is only applicable to public utilities and that the sale of food, magazines, papers and tobacco is not a public utility business. In support of this contention plaintiff relies upon *Story* v. *Richardson,* 186 Cal. 162 [18 A. L. R. 750, 198 Pac. 1057]. That case simply holds that the plaintiff, who was the owner of a large business block, which was supplied with electrical energy and steam from a private plant maintained by plaintiff for that purpose, could not be said to be conducting a public utility in the maintenance and operation of said plant by reason of the fact that he sold the surplus electrical energy and steam from his plant to an adjoining building for the use of the tenants therein. We cannot see that that case helps us to any extent in solving the question before us. Plaintiff is unquestionably conducting a public utility. Its ferry-boats we have held to be a necessary and constituent part of its property used in conducting said public utility. The restaurants and news-stands maintained on said ferry-boats are for the use and convenience of its passengers. The revenue received therefrom is exclusively from passengers using plaintiff's ferry-boats. This being so, we think it necessarily follows that such receipts were properly classified by the board of equalization as operative receipts.

No direct authority on this question has been cited by counsel for either side and we have been unable ourselves to find any such. In the recent case of *California Fire Proof Storage Co. v. Brundige,* 199 Cal. 185 [47 A. L. R. 811, 248 Pac. 669], we held that the telephone directory was an essential instrumentality in connection with the business of a telephone company and that the Railroad Commission had jurisdiction to regulate the form, content and cost to subscribers of directories used by a telephone company. In that case this court held that, "If in the employment of one of its essential instrumentalities it (the telephone company) undertakes to so manipulate its form and use as to make a considerable profit out of that portion of the public which it is thus enabled to serve, we are of the opinion that such profit should to taken account of by the regulating body as are the other earnings of this public utility in determining what just and reasonable rates should be allowed and paid by the public for the service it provides." If the receipts of a telephone company from the printing of a directory, are operative receipts, we think on principle the revenue of the plaintiff from the restaurants and news-stands maintained on its ferry-boats may well be held to belong to the same class. We understand that they are so created by the Railroad Commission in proceedings before that body for the purpose of fixing the fares of plaintiff for its passenger service. It is difficult to conceive how they can be operative receipts for one purpose and nonoperative for another. In our opinion, these receipts were properly classified by the board of equalization in estimating and determining the amount of plaintiff's taxes due the state during the period in question.

As stated above, these "commissaries" on the ferryboats and those in plaintiff's three waiting-rooms, above referred to, were on May 1, 1925, purchased and thereafter operated by the Key System Service Company, a corporation organized for that purpose. As the stock in this corporation, except that held by qualifying directors, was all issued to the plaintiff in consideration of the transfer by plaintiff of the furniture, equipment and stock, used in operating said commissaries, the receipts from this business after May 1, 1925, were by the board of equalization treated in the same manner as the receipts before said transfer.

There can be no question but that this action of the board was proper.

The three "commissaries" maintained by the plaintiff in its waiting-rooms—one in the Ferry Building in San Francisco, one at the Key Route Inn in Oakland and one at Adeline Street and Alcatraz Avenue in Oakland, were also classified as operative property. The evidence as to the particular location of these places of business and as to their accessibility by the general public is exceedingly meager, uncertain and unsatisfactory. The same may be said regarding the floor space rented by plaintiff in its three waiting-rooms maintained in Berkeley, Oakland and San Francisco, respectively. The combined amount involved in these items is small, and it may be for that reason that no particular effort was made to bring before the court the full evidence upon this branch of these actions. As the judgments in each of these actions must be reversed, it would serve no useful purpose for us to attempt to determine the status of this property upon the meager evidence before us. Upon a retrial, if one is had, the evidence in respect to these two classes of property can be produced in greater detail and sufficiently certain as to enable the court to act intelligently upon the questions presented.

Upon the main branch of the case the trial court found in each of these five actions that the ferry-boats of plaintiff were not used exclusively in the operation of plaintiff's railroad business, and that none of the receipts from any of the commissaries or news-stands maintained upon plaintiff's ferry-boats were receipts from property used exclusively, or at all, in the operation of the railroad business of the plaintiff. Upon these findings a judgment was entered in each of said actions in favor of the plaintiff. These findings, in our opinion, are not supported by the evidence.

The judgments therefore are, and each of them is, reversed.

Shenk, J., Richards, J., Seawell, J., Preston, J., Langdon, J., and Waste, C. J., concurred.

Rehearing denied.