[Civ. No. 17176. First Dist., Div. One. Sept. 11, 1957.]

FELLOWSHIP OF HUMANITY (a Nonprofit Corporation), Respondent, v. COUNTY OF ALAMEDA et al., Appellants.

[Civ. No. 17175. First Dist., Div. One. Sept. 11, 1957.]

FELLOWSHIP OF HUMANITY (a Nonprofit Corporation), Appellant, v. COUNTY OF ALAMEDA et al., Respondents.

674

J. F. Coakley, District Attorney, R. Robert Hunter, Chief Assistant District Attorney, James E. Jefferis, Deputy District Attorney, John W. Collier, City Attorney (Oakland), and Robert E. Nesbit, Deputy City Attorney, for Appellants in No. 17176 and Respondents in No. 17175.

McMurray, Brotsky, Walker and Bancroft & Tepper for Respondent in No. 17176 and Appellant in No. 17175.

George Brunn, George Halcrow and Lawrence Speiser as Amici Curiae on behalf of Respondent in No. 17176.

PETERS, P. J.—In the fiscal year 1952-1953 the Fellowship of Humanity, a nonprofit corporation organized under the laws of California, owned certain real property in Oakland. It claimed exemption from city and county property taxes on the ground that the property was used "solely and exclusively for religious worship" within the meaning of article XIII, section 1½ of the state Constitution. Its claim for exemption was denied. After unsuccessfully pursuing its administrative remedies, the Fellowship paid the taxes and penalties under protest, filed its claim, and commenced this action to recover the amounts so paid. The trial court determined that the Fellowship did use its property "solely and exclusively for religious worship" and was entitled to the claimed exemption. It ordered the taxes refunded. The county of Alameda and the city of Oakland appeal from that judgment. That is appeal Number 17176. The Fellowship

appeals from an order taxing costs. That is appeal Number 17175.

The main appeal in Number 17176 was taken by the taxing agencies on the judgment roll so that the evidence produced before the trial court is not before us. ■ This has presented some difficulties to the appellants because, of course, on such an appeal it must be conclusively presumed that all the findings are supported by substantial evidence.

Article XIII, section 1½ of the California Constitution provides, in part: "All buildings, and so much of the real property on which they are situated as may be required for the convenient use and occupancy of said buildings, when the same are used solely and exclusively for religious worship, . . . shall be free from taxation."* (See also Rev. & Tax. Code, § 206.)

The basic problem involved is whether or not, under the findings, the respondent is entitled to this tax exemption. The solution to this problem turns upon whether or not the conclusion that respondent uses its property "solely and exclusively for religious worship," as these terms are used in article XIII, section 1½, is supported by the findings. Appellants contend that the term "religious worship" necessarily requires reverence to, and adoration of, a Supreme Being, and that under the findings the respondent organization does not require as a condition of membership that its members believe in God, and that such an organization does not use its premises "solely and exclusively for religious worship."

The findings are not extensive. So far as pertinent to our discussion, the trial court found that during the tax period involved the property owned by respondent was used for the following purposes:

". . . a meeting was held on each and every Sunday morning at the hour of 11 o'clock A. M.; that at said meeting the following occurred:

"1. There were some periods of meditation by some members of plaintiff;

"2. The singing of a song from a song book entitled, 'Fellowship Songs for the New Era';

"3. A reading from a newspaper or a magazine, or occasionally from the Bible, on the subject chosen by the President of the plaintiff;

---

*The basic amendment so providing was added in 1900. The section was amended in particulars not here relevant in 1952.

"4. The singing of another song from the said song book;

"5. A speaker speaking on a subject of interest to humanists, including subjects of current political and economic interest, sometimes followed by questions and answers;

"6. A collection;

"7. Announcements;

"8. Meditation on the part of some members at close of the meeting; that no audible prayers were said at the said meeting; that there were no expressions of adoration of a god or gods at the said meeting; that the East Bay Peace Committee met weekly on the premises of plaintiff during the aforesaid period; that weekly discussions were conducted by plaintiff on the premises on topics of interest to humanists, including topics of current political and economic interest, on each and every Sunday afternoon, at the hour of 2 o'clock P. M. That organizations other than plaintiff occasionally used the said property with the permission of plaintiff for social gatherings, discussion groups, and lectures; that when said groups used said premises they sometimes made donations for the use thereof and sometimes used them gratis; that when donations were made for the use of said premises, said donations were used in aid and furtherance of the upkeep of plaintiff's said building. That plaintiff held a dance on said property on Wednesday night of each week for its members and their invited friends; that plaintiff held a dinner on said property one Saturday night each month for its members and their invited friends. That said dances and said dinners were held on plaintiff's property for the benefit of plaintiff."

The next finding is to the effect: "That the purpose of plaintiff is to establish and maintain a free fellowship for the study of human relationships from the viewpoint of religion, education and sociology; establishment and the propagation and nurture of the ideals of brotherhood of man, and without any distinctive creed or religious formula; that a further purpose of plaintiff is to promulgate humanism by means of public meetings, lectures, programs, study classes, publishing and distributing literature and such other means as may be deemed practical for the dissemination of constructive and progressive thought."

The court also found that 13 other churches in Oakland, admittedly entitled to the tax exemption, conducted in the tax exempt property discussions of topics of current political and economic interest and held social gatherings, as well as authorizing on the property meetings auxiliary to such

churches, and occasionally permitted outside organizations to use the tax exempt property for social gatherings, discussion groups, and lectures.

Based on these findings, the court concluded that respondent used the property in question "solely and exclusively for religious worship" and that respondent was entitled to the exemption.

It will be noted that the court did not make detailed findings as to the beliefs and aims of respondent. For the purpose of this opinion, however, the court will assume that respondent adheres to the beliefs of humanists, and will further assume that under humanistic doctrine a belief in and reverence of God is not essential to membership. We will further assume that humanists believe that man contains within himself infinite goodness and controls his own destiny, and that a divine or superhuman being has no place in their beliefs. We will assume these things, although the actual findings, while implying that respondent adheres to the tenets of humanism, do not expressly find that respondent rejects the concept of a deity. From a reading of several nonlegal texts on the subject, it may be that a deity actually has a place, although a subtle one, in the beliefs of at least some humanists, and the findings are not necessarily inconsistent with such a concept. But for the purposes of this opinion, in order to meet the issue directly, we will assume that the findings, properly interpreted, are to the effect that the adoration of, and reverence to, a deity have no place in the beliefs of respondent. That presents the fundamental question—is a belief in God or gods essential to "religious worship," as those terms are used in the state Constitution?

This is by no means a simple question. ■ Generally speaking, tax exemption provisions are strictly construed against the taxpayer. Also, generally speaking, the taxpayer has the burden of showing that he comes clearly within the terms of the exemption. This rule of construction certainly applies at least to the so-called "welfare exemption" of the Constitution. (*Cedars of Lebanon Hospital* v. *County of Los Angeles*, 35 Cal.2d 729 [221 P.2d 31, 15 A.L.R.2d 1045].) ■ The court in that case did say, however, that in spite of this strict rule of construction the interpretation must be a reasonable one: ". . . a fair and reasonable interpretation must be made of all laws, with due regard for the ordinary acceptation of the language employed and the object sought to be accomplished thereby." (P. 735; see generally *Watch-*

*tower B. & T. Soc.* v. *County of Los Angeles*, 30 Cal.2d 426 [182 P.2d 178] ; *Goodwill Industries* v. *County of Los Angeles*, 117 Cal.App.2d 19 [254 P.2d 877] ; *Helping Hand Home* v. *San Diego*, 26 Cal.App.2d 452 [78 P.2d 778].)

If this strict rule of construction is applicable in the instant case it can reasonably be argued that the words "religious worship," in their strict and limited sense, and in their commonly accepted sense, include the concept of a Supreme Being governing the universe. ■ Generally speaking, "religious worship" is expressed by prayers, reverence, homage and adoration paid to a deity, and include the seeking out by prayer and otherwise the will of the deity for divine guidance. This is the generally accepted dictionary definition of the term. Webster's Unabridged Dictionary (2d ed.) includes within its definition of the term the following: "Worship: . . . 5. Act of paying divine honors to a deity; religious reverence and homage; adoration, or reverence, paid to God, a being viewed as God, or something held as sacred from a reputed connection with God." "Religion: . . . 1. The service and adoration of God or a god as expressed in forms of worship . . . 6. An apprehension, awareness, or conviction of the existence of a supreme being . . ."

It is not necessary to cite other dictionary definitions. Many dictionaries contain similar definitions.

Some of the decided cases, in various situations, have interpreted the terms "religion," and "religious," and "worship" as including the recognition of a deity. One of the leading cases is *Davis* v. *Beason*, 133 U.S. 333 [10 S.Ct. 299, 33 L.Ed. 637], which approves the restrictive interpretation of the word "religion." That case involved a prosecution for conspiracy. Under federal law citizens of the territory of Idaho were required to swear when registering as electors that they did not practice bigamy or polygamy, and that they were not members of organizations which held as a tenet the practice of polygamy. The Mormon Church, at that time, advocated polygamy, and defendants were members of that church. The question involved was whether the advocacy of polygamy was protected as a "religious" tenet under the federal Constitution. In the course of its opinion the court stated (133 U.S. at p. 342) : "The term 'religion' has reference to one's views of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will." This was probably dicta because the actual holding of this case was that "however

free the exercise of religion may be, it must be subordinate to the criminal laws of the country passed with reference to actions regarded by general consent as properly the subjects of punitive legislation." (P. 342.)

There have also been several cases interpreting the "religious training and belief" exception to the draft act. In *Berman* v. *United States*, 156 F.2d 377 (cert. den. 329 U.S. 795 [67 S.Ct. 480, 91 L.Ed. 680]), the court was required to construe a provision of the Selective Service Act of 1940 which granted an exemption to persons conscientiously opposed to participation in war "by reason of religious training and belief." It was held by the majority that the defendant, who was a humanist, did not qualify, because* (156 F.2d at p. 380): "It is our opinion that the expression 'by reason of religious training and belief' is plain language, and was written into the statute for the specific purpose of distinguishing between a conscientious social belief, or a sincere devotion to a high moralistic philosophy, and one based upon an individual's belief in his responsibility to an authority higher and beyond any worldly one. . . . It would be quite ridiculous to argue that the use of the word 'religion' (in section 1 of the First Amendment) could have been understood by the authors of this part of our national charter or by those having to do with its adoption as meaning to be inclusive of morals or of devotion to human welfare or of policy of government. Congress has and does make laws respecting the establishment of all of these subjects. . . . There are those who have a philosophy of life, and who live up to it. There is evidence that this is so in regard to appellant. However, no matter how pure and admirable his standard may be, and no matter how devotedly he adheres to it, his philosophy and morals and social policy without the concept of deity cannot be said to be religion in the sense of that term as it is used in the statute."

As will later appear there were contrary interpretations of the language of the 1940 act. But Congress apparently approved the definition of the majority in the Berman case when it passed the Universal Military Training and Service Act of 1948 by providing that "[r]eligious training and belief in this connection means an individual's belief in a relation to a Supreme Being involving duties superior to those arising

*The federal Constitution provides in the first amendment: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ."

from any human relation, but does not include essentially political, sociological, or philosophical views or a merely personal moral code." (50 U.S.C.A. App. § 456(j).) In *George* v. *United States,* 196 F.2d 445, 451, the court said of this definition that it "comports with the spirit in which 'Religion' is understood generally, and the manner in which it has been defined by the courts. It is couched in terms of the relationship of the individual to a Supreme Being, and comports with the standard or accepted understanding of the meaning of 'Religion' in American society." The court also pointed out that even if the statutory definition were unduly restrictive, this was a matter for Congress to determine.

There are other cases recognizing that a belief in a Supreme Being is essential to the concept of religious worship. In *United States* v. *MacIntosh,* 283 U.S. 605, 633 [51 S.Ct. 570, 75 L.Ed. 1302], in a dissent by Chief Justice Hughes, is to be found an approval of the definition of religion given in *Davis* v. *Beason,* 133 U.S. 333 [10 S.Ct. 299, 33 L.Ed. 637]. The Chief Justice stated: "The essence of religion is belief in a relation to God involving duties superior to those arising from any human relation. . . . [Here follows the quotation from *Davis* v. *Beason.*] One cannot speak of religious liberty, with proper appreciation of its essential and historic significance, without assuming the existence of a belief in supreme allegiance to the will of God."

The statement of Chief Justice Hughes limiting religions to those faiths who venerate a Supreme Being has not gone unchallenged. In a dissent in the Berman case, which will be discussed more fully later in this opinion, Chief Judge Denman wrote that Chief Justice Hughes was only concerned with MacIntosh's belief in his personal "God" and was not attempting to give an all-inclusive definition of "religion." "To attribute to such highly educated men as Hughes, Holmes, Brandeis and Stone [the four dissenters] an ignorance of Taoism or Comte's humanism, or their denial that either is a religion if the question had been presented to them, would be an unwarranted assertion of their ignorance of the history of religious beliefs." (156 F.2d 384, n. 2.)

There are several state decisions holding or implying in various situations that the commonly accepted and generally understood meanings of "religion" and of "religious worship" include as an essential element the recognition of a deity, and the concomitant obligations which that recognition imposes. (See *Nikulnikoff* v. *Archbishop etc. of Russian*

*O.G.C.Ch.*, 142 Misc. 894 [255 N.Y.S. 653]; *In re Opinion of the Justices*, 309 Mass. 555 [34 N.E.2d 431]; *People* v. *Deutsche Evangelisch Lutherische, etc., Confession*, 249 Ill. 132 [94 N.E. 162]; *People* v. *Board of Education of Dist. 24*, 245 Ill. 334 [92 N.E. 251]; see also cases collected 76 C.J.S. pp. 727-730; see the following annotations: 168 A.L.R. 1222; 83 A.L.R. 773; 22 A.L.R. 907; 81 A.L.R. 1453; 34 A.L.R. 1067, for discussion of related subjects)

These authorities, if a strict, limited interpretation is to be given to the exemption in article XIII, section 1½, would support the conclusion that a belief in a Supreme Being and adoration of that Supreme Being are essential elements of "religious worship"

These cases and definitions do not stand unquestioned. In the first place there are forms of belief generally and commonly accepted as religions and whose adherents, numbering in the millions, practice what is commonly accepted as religious worship, which do not include or require as essential the belief in a deity. Taoism, classic Buddhism, and Confucianism, are among these religions. In the second place, there are dictionary definitions and decided cases holding that the terms "religion" and "religious worship" do not necessarily import a belief in a deity.

The same dictionary cited by appellants (Webster's Unabridged, 2d ed.) contains the following definition of "religion": "8. a. A pursuit, an object of pursuit, a principle, or the like, arousing in one religious convictions and feelings such as great faith, devotion or fervor, or followed with religious zeal, conscientiousness or fidelity as, patriotism was to him a *religion*. b. Acceptance of or devotion to such an ideal as a standard for one's life."

Funk and Wagnalls (1915 edition) contains this definition of "religion": "Any system of faith, doctrine and worship; as the Christian *religion;* the *religions* of the Orient."

Webster also contains a broader definition of the word "worship" than the one relied upon by appellants. It is: "1. To treat with the reverence due to merit or worth; to respect; honor. 2. To revere with extreme respect and veneration."

The Oxford Universal Dictionary, 3d edition, 1955, also contains broad definitions of the terms in question: "Religion . . . 4. A particular system of faith and worship . . ." "Worship" is defined as "b. . . . Veneration similar to that paid to a deity"

The Encyclopedia of the Social Sciences includes at least Taoism and classic Buddhism as among "those religions which lack the conception of an omnipotent and transcendant God." (Vol. 13, p. 237.)

There are also a series of cases holding or implying in various situations that the terms in question should not or constitutionally cannot be limited to those faiths revering a deity, and holding that a belief in a deity is not essential to religion, or religious worship.

In *Estate of Hinckley*, 58 Cal. 457, the income of a trust was to be devoted to foster "Religion, Learning and Charity." The court was called to pass upon whether "religion" was a valid charitable purpose. In holding that it was the court stated (p. 512) : "In its primary sense (from *religare*, to re-bind, to bind back), it imports, as applied to moral questions, only a recognition of a conscientious duty to recall and obey restraining principles of conduct. In such sense we suppose there is no atheist who will admit that he is without religion."

In *Ex parte Jentzsch*, 112 Cal. 468 [44 P. 803, 32 L.R.A. 664], the court held a statute requiring barbershops to be closed on Sundays and legal holidays to be unconstitutional. The court stated that a Sunday closing statute should not be considered as a religious enactment, but as a civil and secular enactment, and reasoned as follows (p. 471) : "Under a constitution which guarantees to all equal liberty of religion and conscience, any law which forbids an act not itself *contra bonos mores*, because that act is repugnant to the beliefs of one religious sect, of necessity interferes with the liberty of those who hold to other beliefs or to none at all.

"Liberty of conscience and belief is preserved alike to the followers of Christ, to Buddhist and Mohammedan, to all who think that their tenets alone are illumined by the light of divine truth; but it is equally preserved to the skeptic, agnostic, atheist, and infidel, who says in his heart, 'There is no God.' "

In *United States* v. *Kauten*, 133 F.2d 703, and in *United States* v. *Downer*, 135 F.2d 521, the Second Circuit gave a much broader interpretation to the phrase "religious training and belief" in the draft act than was given by the majority in the Berman case, *supra*, written by the Ninth Circuit. In the Kauten case the court held that the phrase in question did not require a belief in a deity to entitle the registrant to the exemption. Justice Augustus Hand, speaking for the court, defined the type of belief that would qualify the regis-

trant for the exemption as follows (p. 708): "We are not convinced by anything in the record that the registrant did not report for induction because of a compelling voice of conscience, which, we should regard as a religious impulse, . . . Religious belief arises from a sense of the inadequacy of reason as a means of relating the individual to his fellow-men and to his universe—a sense common to men in the most primitive and in the mostly highly civilized societies. It accepts the aid of logic but refuses to be limited by it. It is a belief finding expression in a conscience which categorically requires the believer to disregard elementary self-interest and to accept martyrdom in preference to transgressing its tenets."

Just three months later the same court in the Downer case, *supra*, found one Randolph Phillips to be a conscientious objector. Phillips "received his early religious training in the Presbyterian Church, although he stated that he was not now a member of any religious sect or organization. He is opposed to killing men, or assisting directly or indirectly in the killing of men . . . He would not fight even to repel invasion, but believes that 'war is ethically and invariably wrong.' . . . '[F]rom whom I derived my opposition to killing men . . . I cannot specifically say. . . .' . . . His further sworn assertion that 'my opposition to war is deep-rooted, based not on political considerations but on a general humanitarian concept which is essentially religious in character,' appears, therefore, borne out by the record." (135 F.2d at p. 523.) The exemption was granted.

The definitions thus given by the Second Circuit were disapproved by the majority opinion in the Berman case, and were apparently disapproved by Congress when it amended the draft act in 1948 and adopted the limited definition of the Berman case. However, as already indicated, the Berman decision was not unanimous. Chief Judge Denman wrote a strong and convincing dissent. He was willing to adopt the broad definitions of "religious training and belief" found in the Kauten and Downer cases. The dissent is entitled to particular consideration because the appellant in that case was a humanist. There is much worthy of note in the opinion, but the following quotation is particularly relevant (156 F.2d at p. 384): "It is true that there is no evidence that Berman's religious conviction that he should not kill his fellow man flowed from the command of some god or gods of one or another of the world's many religious congregations, and

we may assume that such was not its source. But many of the great religious faiths with hundreds of millions of followers have no god. . . . It is wrong to say that 'a sincere devotion to a moralistic philosophy' is inconsistent with 'a belief in his responsibility to an authority higher and beyond any earthly one,' if that supernatural authority is confined to a belief in a particular god. This would exclude all Taoist China and in the Western world all believers in Comte's religion of humanism in which humanity is exalted into the throne occupied by a supreme being in monotheistic religions.''

There is an Illinois case that is also worthy of mention. It is *In re Walker*, 200 Ill. 566 [66 N.E. 144], which involved the interpretation of a constitutional provision very similar to the one involved here. The court, in interpreting the words ''property used exclusively for . . . religious purposes'' appearing in the Illinois Constitution, and the words ''church property actually and exclusively used for public worship,'' appearing in the Illinois statute, felt that such terms must be interpreted in connection with an Illinois constitutional provision similar to article I, section 4 of the California Constitution.* In this connection the Illinois court stated (p. 147) : ''[O]ur constitution therefore constitutes a guaranty of absolute freedom of thought and faith, whether orthodox, heterodox, Christian, Jewish, Catholic, Protestant, liberal, conservative, Calvinistic, Armenian, Unitarian, or other religious belief, theology, or philosophy, and also the right of the free exercise and enjoyment of religious professions and worship of any variety or form; the only restraint upon the free

---

*Article I, section 4 of the California Constitution provides: ''The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be guaranteed in this State.'' This provision has been in our Constitution since 1849.

There are other provisions of the California Constitution besides article XIII, section 1½, and article I, section 4, to which reference should be made. Thus article XIII, section 1c, provides that in addition to other exemptions in the Constitution the Legislature ''may exempt from taxation all or any portion of property used exclusively for religious, hospital or charitable purposes and owned by . . . corporations organized and operated for religious, hospital or charitable purposes, not conducted for profit.''

Article IX, section 8, provides in part: ''. . . nor shall any sectarian or denominational doctrine be taught, or instruction thereon be permitted, directly or indirectly, in any of the common schools of this State . . .''

Under the provisions of article IV, section 30, all government tax agencies are prohibited from making any appropriation from any public fund, or from granting ''anything to or in aid of any religious sect, church, creed, or sectarian purpose.''

exercise of liberty of conscience being that oaths and affirmations shall not thereby be dispensed with, licentious acts excused, or practices justified which are dangerous to the peace and safety of the state.

"Any definition of 'public worship,' to be acceptable, must be sufficiently broad and comprehensive to include within the beneficial operation of the statute of exemptions the church property of all congregations, and every denomination or form of religious faith and worship. The difficulties attending the task of formulating a definition of the term 'public worship,' so that it will be applicable to and comprehend every variety of religious faith and belief, and every religious philosophy of life and death, and omit none, is apparent."

There is one other case to which reference should be made—a case that was decided by the District of Columbia Tax Court after the instant case was tried, and a case which is now on appeal to the United States Court of Appeals for the District of Columbia Circuit. The case is *Washington Ethical Society* v. *District of Columbia*, the tax court decision being reported in 84 Wash. Law. Reporter 1072. In that case the tax court was presented directly with the precise question involved in the instant case—whether the reverence of a deity is a prerequisite to the receiving of a tax exemption for church property. The tax court was presented with a statute exempting church buildings from real property taxation when "primarily and regularly used for religious worship . . ." It was required to determine whether the Washington Ethical Society was a church within the meaning of this statute. The Washington Ethical Society is an affiliate of the American Ethical Union, and adheres to their tenets, beliefs and practices. These tenets, beliefs and practices are substantially similar to the basic beliefs, tenets and practices of respondent in the instant case. The essential thesis of the Ethical Movement, as stated by the tax court (p. 1074) is that "morals, ethical conduct and right living are good in themselves, and for that reason must be practiced, and not because of any command or sanction of any deity or Supreme Being . . .

". . . Its basis fundamentally is the negation of a personal God or any Supreme Being. It denies that there is some heavenly father or deity which is concerned with the affairs of men; . . . that it is futile to appeal to such or to thank him for the blessings or blame him for the ills of mankind; that we mortals alone are responsible for advantages and disadvantages; and that if we are to be helped, we must help ourselves. . . .

"The Ethical Movement does not require that any of its members believe in, or have any concept of God."

Were the buildings of this organization used for "religious worship" within the meaning of the statute? The court in an exhaustive opinion came to the conclusion, after expressing many doubts on the subject, that such buildings were not used for religious worship. It quoted from many authorities to the effect that a belief in a deity is not essential to a religion, and pointed out that the case law defining the term was "somewhat confused" (p. 1078). It then cited and discussed many of the cases already cited in this opinion, and cited and discussed many others not cited herein. It then concluded (p. 1082): "After considering all of the foregoing sources bearing upon the meaning of religion, the Court concludes that the generally accepted definition of religion . . . is substantially the same as that adopted and approved in the Selective Service Act of 1948 and the Naturalization Act of 1950, that is to say, 'belief in relation to a Supreme Being involving duties superior to those arising from any human relation, but does not include essentially political, sociological, or philosophical views of a merely personal moral code.' " Such definition, it was held, "comports with the primary definition in most of the dictionaries and encyclopedias and in the majority of the decisions of the courts, and appears to be most generally accepted."

It can be observed from this review of the dictionary definitions, and of the case law, that the definitions given are confused, uncertain and certainly not conclusive. In all of the cases cited, except the tax case, the courts were not faced with the precise problem here involved. The most that can be said of these decisions is that there are expressions approving and disapproving the view that "religious worship" need not necessarily involve the concept of homage to a deity. In many of the apparently conflicting cases the result can be explained, in part at least, by the context in which the question was presented.

The views of scholars in this confused field are also conflicting. Many define "religion" in terms of a deity or of a Supreme Being. To others theism plays little or no part in their concept of the term. Many of these authorities are compiled in the amicus curiae brief of the American Civil Liberties Union. Others are referred to in the tax court opinion, *supra*. Little would be gained by attempting to compile the conflicting views. Suffice it to say that many

authorities in the field include nontheistic beliefs among the world's recognized religions. Particularly pertinent is the following statement by Francis Potter in "The Story of Religion" (p. XVII): "A new definition of religion itself is already emerging. Whereas Cicero was satisfied to call it 'the pious worship of God,' and Menzies only a generation ago won acclaim for terming it 'the worship of higher powers from a sense of need,' there is a tendency today to question the necessity of including the supernatural in a definition of religion.

"The idea of religion without God is shocking to Christians, Jews, and Muhammadans, but Buddha and Confucius long ago founded nontheistic religions and some modern Unitarian Humanists insist that the idea of God is a positive hindrance to the progress of real religion.

"An inclusive definition, then, must recognize both varieties of religion, theistic and non-theistic.

"The author's present definition of religion and religions is as follows:

"*Religion*: is the endeavor of divided and incomplete human personality to attain unity and completion, usually but not necessarily by seeking the help of an ideally complete divine person or persons.

"*Religions* are systems of belief and practice which arise among the disciples of some man who has attained a satisfying measure of success in his endeavors to unify and complete his personality."

One of the most respected groups to recognize the humanists as a religious group are the Unitarians. Unitarianism is generally accepted by most authorities as one of the recognized religions. Yet under Unitarian doctrine there is a peaceful coexistence of theists and humanists. A substantial part of the membership and clergy of the Unitarian Church are humanists. In the "Pocket Guide to Unitarianism," edited by Harry B. Scholefield, appears the following (p. 4):

"Some Unitarians call themselves 'humanists' and others call themselves 'theists.' The difference between the two groups is not so much a matter for controversy as for mutual understanding and appreciation. The humanist is content, before this life's unanswerable questions, to leave them unanswered. He sees enough in the human scene to demand all his energies of mind and spirit. The fundamental questions seem real enough, but speculation upon them seems hopeless, and all answers proposed must rest upon what William James

called 'over-beliefs.' The humanist says in effect, 'One world at a time. I am interested in the world where I am now, in the moral purposes and meanings which the human mind has infused into it, and in the achievement of such ethical goals and ways of life as are possible.' A similar attitude was taken by Buddha . . .''

It is quite apparent from what has been said that authorities can be found to support a limited definition of the terms involved, and that other authorities can be found to support a broader interpretation. It will be noted that, generally speaking, those who advocate the limited definition draw the line in reference to a particular belief held or not held by the group involved: i.e., do the members of the group believe in God? Their position appears to be that the sole criterion of "approved" religious activity is activity which centers around a deity. This interpretation could lead to some strange results. ■ Certainly, even appellants would not limit the exemption to those who believe in the Christian or Judaic God. The worship of other gods would clearly fall within the exemption. Appellants, at oral argument, conceded that even idol worshipers would qualify for the exemption under the test advocated by them. It also follows, of course, that a great many unorthodox but theistic cults in the United States, such as Father Divine's Peace Mission Movement, whose followers believe that Father Divine is God, would qualify for the exemption. Drawing the dividing line between theistic and nontheistic beliefs would seem to be somewhat arbitrary. ■ In a country where religious tolerance is accepted it would not seem that the limited definition is in accord with our traditions.

There is another factor to be considered. Underlying the whole subject is the First Amendment to the United States Constitution which provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The provisions of the California Constitution guaranteeing a separation of church and state have already been quoted. ■ The First Amendment to the United States Constitution is made applicable to the states by the Fourteenth Amendment. (*Cantwell* v. *Connecticut*, 310 U.S. 296 [60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352].)

Just what does this provision mean when it is applied to state tax exemptions of church property? ■ It is perfectly obvious that any type of statutory exemption that discriminates between types of religious belief—that discrimi-

nates on the basis of the content of such belief—would offend both the federal and state constitutional provisions. Thus the United States Supreme Court stated in *Everson* v. *Board of Education*, 330 U.S. 1, 15 [67 S.Ct. 504, 91 L.Ed. 711, 168 A.L.R. 1392] : "Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another." In *American Sugar Refining Co.* v. *Louisiana*, 179 U.S. 89, 92 [21 S.Ct. 43, 45 L.Ed. 102], appears the following: "Of course, if such [tax exemption] discrimination were purely arbitrary, oppressive or capricious, and made to depend upon differences of color, race, nativity, religious opinions, political affiliations or other considerations having no possible connection with the duties of citizens as taxpayers, such exemption would be pure favoritism, and a denial of the equal protection of the laws to the less favored classes." (See also *Watchtower B. & T. Soc.* v. *County of Los Angeles*, 30 Cal.2d 426 [182 P.2d 178], which broadly implies that a tax discriminating between types of religious belief is unconstitutional.)

 Under the constitutional provision the state has no power to decide the validity of the beliefs held by the group involved. The principal case establishing this concept is *United States* v. *Ballard*, 322 U.S. 78, 86 [64 S.Ct. 882, 88 L.Ed. 1148], which holds that: "Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs." (See Silving, "The Unknown and the Unknowable," 35 Cal.L.Rev. 352.) If those concepts are sound, and it is submitted that they are well settled, then the only valid test a state may apply in determining the tax exemption is a purely objective one. Once the validity or content of the belief is considered, the test becomes subjective and invalid. Thus the only inquiry in such a case is the objective one of whether or not the belief occupies the same place in the lives of its holders that the orthodox beliefs occupy in the lives of believing majorities, and whether a given group that claims the exemption conducts itself the way groups conceded to be religious conduct themselves. The content of the belief, under such test, is not a matter of governmental concern.

Under this test the belief or nonbelief in a Supreme Being is a false factor. The only way the state can determine the existence or nonexistence of "religious worship" is to approach the problem objectively. It is not permitted to test validity of, or to compare beliefs. This simply means that

"religion" fills a void that exists in the lives of most men. Regardless of why a particular belief suffices, as long as it serves this purpose, it must be accorded the same status of an orthodox religious belief. Of course, the belief cannot violate the laws or morals of the community, but subject to this limitation, the content of the belief is not a matter of governmental concern.

 If this be a correct approach, and we submit that it is, the proper interpretation of the terms "religion" or "religious" in tax exemption laws should not include any reference to whether the beliefs involved are theistic or nontheistic. Religion simply includes: (1) a belief, not necessarily referring to supernatural powers; (2) a cult, involving a gregarious association openly expressing the belief; (3) a system of moral practice directly resulting from an adherence to the belief; and (4) an organization within the cult designed to observe the tenets of belief. The content of the belief is of no moment. Assuming this definition of "religion" is correct, then it necessarily follows that any lawful means of formally observing the tenets of the cult is "worship," within the meaning of the tax exemption provision. Admittedly, respondent meets these tests.

There is still another problem involved that has not been discussed, and that is the anomalous nature of the church exemption. Direct tax subsidies of any church or sect or of all churches and sects are undoubtedly prohibited by the First Amendment to the United States Constitution above quoted. Separation of church and state is compelled by the federal and state Constitutions. As stated by Mr. Justice Shenk, speaking for the majority of the court in *First Unitarian Church* v. *County of Los Angeles*, 48 Cal.2d 419, at p. 434 [311 P.2d 508] : "Without the slightest doubt the First Amendment reflects the philosophy that church and state should be kept separate." A tax exemption is, obviously, an indirect subsidy. Thus, logically, any tax exemption to a church, regardless of the beliefs of its members, can be questioned. The more recent United States Supreme Court cases have indicated how divided that court is on this problem, and have made it clear that it is not easy to justify logically the tax exemption provisions. In *Everson* v. *Board of Education*, 330 U.S. 1 [67 S.Ct. 504, 91 L.Ed. 711, 168 A.L.R. 1392], the majority of the court upheld payment by a school board that compensated parents for their children's bus fares even though the children were attending parochial schools.

The court stated that the state had gone to the "verge" of its constitutional power, and then stated (p. 15) : "Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. . . . No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion." That is ominous language so far as the validity of tax exemption provisions for churches is concerned.

In *McCollum* v. *Board of Education,* 333 U.S. 203 [68 S.Ct. 461, 92 L.Ed. 649, 2 A.L.R.2d 1338], the court was faced with a so-called "released time" statute under which children in public schools were given, if they desired, time off from regular school work, to attend sectarian religious instruction classes conducted by the church of their choice. The classes were held on school property. The statute was held to be unconstitutional. The court stated (p. 212) : "Here not only are the State's tax-supported public school buildings used for the dissemination of religious doctrines. The State also affords sectarian groups an invaluable aid in that it helps to provide pupils for their religious classes through use of the State's compulsory school machinery. This is not a separation of Church and State."

The most recent opinion in point is *Zorach* v. *Clauson,* 343 U.S. 306 [72 S.Ct. 679, 96 L.Ed. 954], which upheld a "released time" statute where the classes were not held on school property. The philosophy of the opinion indicates no important retreat from the principles previously announced. At page 314 appears the following: "Government may not finance religious groups nor undertake religious instruction nor blend secular and sectarian education nor use secular institutions to force one or some religion on any person. But we find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence."

Without delving into the subleties of the various majority, concurring and dissenting opinions in these cases, which contain frequent references to the constitutional prohibition against discrimination between religious sects, it is the view of many legal commentators that the rationale of these opinions makes it difficult to uphold, logically, the church exemption provisions. (See, for example, Paulsen, *Preferment of*

*Religious Institutions in Tax and Labor Regulation,* 14 Law and Contem. Problems, 144, 148; *Constitutionality of Tax Benefits Accorded Religion,* 49 Columb. L. Rev. 968; 9 Stan. L. Rev. 366; see also Silving, the *"Unknown and the Unknowable,"* 35 Cal. L. Rev. 352, 365.)

On the other hand we know, of course, that every state and the District of Columbia has a constitutional or statutory provision exempting church property from taxation. In most of the cases where these statutes have received judicial consideration, their constitutionality has been assumed. In California the Supreme Court recently has held that the tax exemption provision is valid. It was so held in *Lundberg* v. *County of Alameda,* 46 Cal.2d 644 [298 P.2d 1]. That case involved the validity of a tax exemption to property "used exclusively for school purposes . . . and owned and operated by religious, hospital or charitable funds, foundations, or corporations" subject to certain limitations. (Rev. & Tax. Code, § 214.) The court held that the First Amendment to the United States Constitution was not violated because, first, the religious school exemption was enacted to promote the public welfare by encouraging the education of the young, and second, such provisions must be upheld because of their very universality. In connection with this second point, the court stated (pp. 654-655) : "Secondly, even if we regard the exemption as benefiting religious organizations, it does not follow that it violates the First Amendment. The practice of granting tax exemptions benefiting religious sects began in the colonial period. (See Paulsen, *Preferment of Religious Institutions in Tax and Labor Legislation* (1949), 14 Law & Contemp. Prob. 144, 147-148; Torpey, *Judicial Doctrines of Religious Rights in America* (1948), ch. VI, pp. 171-174; Zollman, *Tax Exemptions of American Church Property* (1916), 14 Mich. L. Rev. 646, 647-650.) Today, at least some tax exemption for religious groups is authorized by statutory or constitutional provisions in every state and the District of Columbia, as well as by federal law. (See note (1949) 49 Columb. L. Rev. 968, 969-982.) No case has been found holding that the granting of such exemptions is contrary to state or federal constitutional provisions prohibiting the support or establishment of religion, and, where the matter has been raised, the exemptions have been upheld. (*Garrett Biblical Institute* v. *Elmhurst State Bank,* 331 Ill. 308 [163 N.E. 1, 5] ; *Trustees of Griswold College* v. *State of Iowa,* 46 Iowa 275, 282 [26 Am. Rep. 138].) The United States Supreme Court, in

discussing the prohibition of laws respecting the establishment of religion, recently stated that the standard of constitutionality is the separation of church and state, and that the problem, like many others in constitutional law, is one of degree. (*Zorach* v. *Clauson,* 343 U.S. 306, 314 [72 S.Ct. 679, 96 L.Ed. 954].) The principle of separation of church and state is not impaired by granting tax exemptions to religious groups generally, and it seems clear that the First Amendment was not intended to prohibit such exemptions. Accordingly, an exemption of property used for educational purposes may validly be applied to school property owned and operated by religious organizations.''

It is interesting to note that the United States Supreme Court dismissed an appeal in the Lundberg case because that appeal did not present a ''substantial federal question.'' (352 U.S. 921.)

The first reason given by the Supreme Court of California for upholding the exemption is not applicable to the church exemption. The second one is applicable. ▮ *Certainly,* while the very universality of the practice of exempting church property from taxation may not be a conclusive test of constitutionality, it *certainly* is a sound reason for courts to be extremely reluctant to take any steps to disturb such a practice.

This discussion about the validity of church tax exemption provisions is not indulged in because the members of this court have any doubts about the constitutionality of such provisions, but because the discussion suggests, first, that a logical and legal justification of such provisions must be found, and secondly, that in interpreting such provisions the court should be very careful not to limit them by such a narrow construction that by the very limitations imposed, constitutionality is adversely affected.

First, as to a legal justification for the provisions. ▮ It is sound public policy to encourage, by tax exemption as well as by direct subsidy, private undertakings in the fields that are properly within the realm of governmental responsibility. Thus, welfare, charitable and private educational grants and subsidies are valid. All churches that warrant the exemption perform some of these tasks. Therefore, churches can be indirectly subsidized for the performance of these tasks. But this indirect subsidy is not for the activities that are peculiarily religious in the sense of dogma or doctrine, but for the many other things all churches do which are properly cog-

nizable by the state. This is the legal justification suggested in several of the above articles. This view received indirect judicial recognition in the dissenting opinion of Mr. Justice Reed in the McCollum case when he stated (333 U.S. at p. 249): "It seems clear to me that the 'aid' referred to by the Court in the Everson case could not have been those incidental advantages that religious bodies, with other groups similarly situated, obtain as a by-product of organized society. This explains the well-known fact that all churches receive 'aid' from government in the form of freedom from taxation." It also received judicial recognition in the majority opinion in *First Unitarian Church* v. *County of Los Angeles,* 48 Cal. 2d 419, 438-439 [311 P.2d 508], when it was stated: "This legitimate objective [to grant the church exemption] is sought to be accomplished by placing in a favored economic position, and thus to promote their well being and sphere of influence, those particular persons and groups of individuals who are capable of formulating policies relating to good morals and respect for the law. It has been said that when church properties are exempted from taxation 'it must be because, apart from religious considerations, churches are regarded as institutions established to inculcate principles of sound morality, leading citizens to a more ready obedience to the laws.' (*County of Santa Clara* v. *Southern Pac. R. Co.,* 18 F. 385, 400 . . .)"

How do these observations apply to the instant case? ▮ The answer is obvious. We should interpret article XIII, section 1½, if possible, so as not to offend the federal Constitution. If the words "religious worship" are given a narrow, limited meaning, so as to require a belief in and adoration of a Supreme Being, then grave doubts would exist as to the constitutionality of the section. On the other hand, a definition which emphasizes the "nonreligious" facets of the conduct of respondent will serve to sustain the constitutionality of the section. Our interpretation of the tax exemption provision must be as broad as is reasonably necessary to uphold it. If we limit the exemption to those who advocate theism then it is quite possible that the Supreme Court of the United States may hold that such an interpretation encourages particular religious doctrines and practices and thus violates the division between church and state. ▮ Theism is a concept which is peculiar to religious theory and practice in the technical sense. It is not a feature common to those advantages gained by the state and supportable by it, through the

activities of private educational and charitable institutions. The problem can be reduced to a simple formula. If the state cannot constitutionally subsidize religion under the First Amendment, then it cannot subsidize theism. If the state can constitutionally subsidize those functions of religious groups which are not related to "religion" in its narrow sense, then it must subsidize those nontheistic groups which perform the same functions. The First Amendment precludes a classification based on them.

The basic question then is not whether theism is necessarily the basic element of "religion." It can be assumed that the words "religious worship" in the ordinary and commonly used sense require a belief in a Supreme Being. But the United States Constitution prohibits a subsidy to foster "religious worship," used in this sense. The real question is whether the activities of the Fellowship of Humanity which in the above sense are "nonreligious," and which include all of the Fellowship's activities, are analogous to the activities, serve the same place in the lives of its members, and occupy the same place in society, as the activities of the theistic churches. In the present case, it is conceded that in all respects the Fellowship's activities are similar to those of the theistic groups, except for their belief or lack of belief in a Supreme Being. It therefore follows that the constitutional exemption is equally applicable to both groups. Respondent is therefore entitled to the exemption.

 The next contention of appellants is that even if the property of respondent is devoted to "religious worship" as those words are used in article XIII, section 1½ of the California Constitution, such property is not used "solely and exclusively" for such purpose within the meaning of the section. Appellants rely on the findings to the effect that the property is occasionally used by other organizations and occasionally for dances, dinners and meetings held by respondent. The contention does not require lengthy consideration. Such provisions are to be "reasonably construed, having in mind the object of the provision, and in furtherance of its underlying intent." (*San Francsico-Oakland T. Rys.* v. *Johnson,* 210 Cal. 138, 150 [291 P. 197].) One of the cases referred to with approval in that case is *First Unitarian Soc.* v. *Town of Hartford,* 66 Conn. 368 [34 A. 89]. The court there stated (p. 90): "The policy on which the exemption of church buildings from taxation is granted is the encouragement of religion; and that policy is not hindered, but,

rather, promoted, by permitting this building to be used for profit when not needed for those services distinctly called 'religious services'; for literary, scientific, or entertaining exercises, or for any other thing not inappropriate to be had in a church.''

Under the cases, it is certainly well settled that however strict the courts may be in determining whether the use of property brings it within the exemption at all, if the court once holds that the property generally qualifies for the exemption, it will be extremely liberal in holding that some incidental use does not take it out of the exemption. Thus in *Y.M.C.A.* v. *County of Los Angeles*, 35 Cal.2d 760 [221 P.2d 47], the court held that the welfare exemption for property ''used exclusively . . . for charitable purposes'' included dormitory facilities, the income of which constituted a substantial portion of the operating income of the Y.M.C.A.

The findings refer to the fact that 13 other churches, admittedly entitled to the tax exemption, carry on incidental activities similar to the ones conducted by respondent. This, at least, amounts to an administrative interpretation of the extent of the exemption, which is entitled to some weight.

Appellant's last contention is a technical one, and it is that respondent made the protested payment of the second installment of the 1952-1953 taxes here involved, too late to be entitled to a refund.

The argument that the payment under protest was made too late is largely based on *First Congregational Church* v. *County of Los Angeles*, 9 Cal.2d 591 [71 P.2d 1106]. That decision was grounded on the former Political Code section 3819 and held that a prerequisite to the recovery of payments made under protest was that there must be a tender of the protested payments before the delinquent roll is turned over to the auditor by the tax collector. The apparent basis for the holding was the requirement that protest payments be made to the tax collector while he still has possession of the roll, and that after the collector had given up possession of the roll there was no one to whom such payment could be made. Section 3819 of the Political Code then read, in part: ''At any time after the assessment book has been received by the tax collector, and the taxes have become payable, the owner of any property assessed therein, who may claim that the assessment is void in whole or in part, may pay the same to the tax collector under protest, which protest shall be in writing, and shall specify whether the whole assessment is

claimed to be void, or if a part only, what portion, and in either case the ground upon which such claim is founded and when so paid under protest, the payment shall in no case be regarded as voluntary payment . . ."

The present sections are not identical with the old Political Code section. Section 5136 of the Revenue and Taxation Code reads in part: "After taxes are payable, any property owner may pay the taxes on his property under protest."

Section 5137.5 of that code reads: "The written protest shall be numbered by the tax collector and filed in his office and the fact of such protest and the number thereof shall be marked on the roll or delinquent roll, opposite the tax to which the payment relates."

Section 2628 of that code reads: "On or before June 30th or immediately after the time when real property is sold to the State for taxes, whichever is later, the tax collector shall attend at the auditor's office with the delinquent roll."

Also pertinent are sections 5142 and 4104.4 of that code. The former recognizes the possibility of recovering payments made after delinquency, while the latter provides that a county may designate the tax collector as a redemption officer.

In the instant case the respondent paid the second installment to the county auditor under protest on July 28, 1954. At that date the county tax collector should no longer have had the delinquent roll in his possession. (Rev. & Tax. Code, §§ 2628, 3436, 3451.)

The parties spend much time in arguing about the proper interpretation of these and related sections. The sections can be interpreted as was the old law in the Congregational Church case, *supra*. They can also be interpreted to mean that under section 5136 payments under protest can be made at any time; that under section 5142 payment may be made after the taxes are delinquent, and that under section 5137.5 an original payment and protest may be filed with some official other than the tax collector.

We do not find it necessary to resolve the conflict over these sections. These sections all relate to the payment of taxes under protest. This is not the only statutory method provided for the recovery of taxes after they are paid. The Revenue and Taxation Code in sections 5136 to 5143 above considered provide for the recovery of taxes paid under protest, but chapter 5 of part 9 of division 1 provides for not only that method but a second method of recovery. Article I of the chapter (§§ 5096-5107) permits actions by the taxpayer within

six months after a claim for refund has been denied by the board of supervisors. Article 2 gives the taxpayer an alternative means of recovery by permitting an action within six months after payment under protest. The documents attached to the complaint indicate that so far as the second installment of taxes is concerned the respondent used both procedures. They show that the claim and protest were each filed as required by sections 5097 and 5137 of the Revenue and Taxation Code on August 26, 1954, and July 28, 1954. The action was commenced December 24, 1954, within six months of both claim and protest. Thus the respondent's claim is not limited to an action on a protested payment. The claim procedure is silent as to when the payment must be made, but simply provides that the claim must be filed within three years after the payment sought to be refunded. (Rev. & Tax. Code, § 5097.) The other contentions of appellants on this point are clearly without merit and need not be discussed.

For the foregoing reasons in appeal Number 17176 the trial court properly held that respondent was entitled to the refund. That judgment should be affirmed.

### APPEAL BY THE FELLOWSHIP NUMBER 17175

On this appeal the parties are reversed. The Fellowship of Humanity appeals from an order taxing costs, by which the trial court disallowed to the fellowship as the successful party the cost of taking the deposition of a Dr. Warmer, amounting to $55.

This deposition was taken under the following circumstances: In preparing for the trial of the main action the Fellowship wanted to secure evidence that other churches admittedly entitled to the exemption, occasionally used the exempt property for purposes other than "worship," and that this did not violate the "solely and exclusively" provision of article XIII, section 1½. One of the 13 witnesses, all ministers of different churches, that the Fellowship wanted to testify was Dr. Warmer, a Methodist minister. His deposition was taken before trial because he believed and expected that he would be absent from Alameda County at the time of trial, and so testified during the course of the deposition. At the trial the Fellowship offered the deposition in evidence. The defendants objected on the grounds of irrelevancy and immateriality. The objection was overruled. Defendants then stipulated that the deposition could be read into the record

as if Dr. Warmer were still absent from the county. In fact, Dr. Warmer was present in the county. The deposition was then accepted in evidence.

The deposition is not before us. The defendants, however, do not object to the Fellowship's statement that Dr. Warmer testified that the First Methodist Church of Oakland had a tax exemption although classes were conducted on the church property and lectures given on various topics aimed to meet human needs; also that sporting and social events occasionally took place on church property, and that other organizations occasionally used the property.

The court, on motion of defendants to disallow $55 as the cost of Dr. Warmer's deposition for the reason that it was "unnecessary in said action," disallowed this item.

There can be no doubt that in such an action as is here involved the successful plaintiff is entitled to his costs, as "of course." (Code Civ. Proc., § 1032.) Under the provisions of section 1032a of that code, such plaintiff is "entitled to the reasonable cost of taking and transcribing depositions . . . unless it shall appear to the court that the taking of such deposition was unnecessary." Defendants point out that Dr. Warmer stated that he never contemplated being absent during the entire trial, and that he was only one of many others present in the county who could testify to the desired facts.

█ The trial court has a broad discretion in the allowance or disallowance of costs to the successful party. (*Welch* v. *Alcott*, 178 Cal. 530 [174 P. 34]; *Lomita Land & Water Co.* v. *Robinson*, 154 Cal. 36 [97 P. 10, 18 L.R.A.N.S. 1106].)

█ Thus the only problem is whether the trial court abused its discretion in disallowing this item. We do not think it did.

The Fellowship calls attention to the fact that the trial court admitted the deposition in evidence, overruling an objection that it was immaterial and irrelevant, and contends that this conclusively proves that the deposition was a necessity. But "necessity" and "relevancy" are by no means the same things. Many bits of evidence might be "relevant," but still be "unnecessary." Here the trial court knew that many other ministers were available to testify on the subject that Dr. Warmer testified to, and could reasonably and within its discretion, determine that the testimony while relevant was not necessary.

The Fellowship also seems to think it important that defendants stipulated to the introduction of the deposition, although

Dr. Warmer was then physically within the county and available as a witness. This is an immaterial factor. In determining whether the taking of the deposition was ''necessary'' the trial court was required to make its determination from the circumstances as they appeared when it was taken. The subsequent stipulation had no bearing on the determination of this question. There was no abuse of discretion in disallowing the item.

In appeal Number 17176 the judgment appealed from is affirmed.

In appeal Number 17175 the order appealed from is affirmed.

Dooling, J., concurred.*

BRAY, J.—I dissent in Number 17176.

The majority opinion holds in effect: (1) That the entity to receive the tax exemption provided by article XIII, section 1½ of the California Constitution, must use its property for ''religious worship.'' This, of course, is obvious. The Constitution so provides. (2) That apparently, in order to avoid the application of the First Amendment to the United States Constitution, the courts in determining the validity of tax exemptions to entities using property for religious worship have held that it is not the fact that the property is so used that makes the exemption valid but the fact that those entities use the properties not only for religious worship, but also ''to inculcate principles of sound morality'' (*County of Santa Clara* v. *Southern Pac. R. Co.*, 18 F. 385, 400), or as the majority opinion states, ''for the many other things all churches do which are properly cognizable by the state.''

Thus, we have the rather anomalous situation that the entity must be a religious one which type is prohibited from receiving any consideration from government and yet because it uses its property for cultural, social and moral purposes, it is entitled to the exemption in spite of its main purpose.

The third holding, then, is that any entity which, although admittedly not using its property for ''religious worship'' in the strict sense (and in the sense which undoubtedly was intended by the people and the legislators at the time the exemption was placed in the various state constitutions) may in a broad sense pursue its principles with religious fervor and provide those ''other things all churches do which are

*Assigned by Chairman of Judicial Council.

properly cognizable by the state," must likewise be interpreted as engaged in "religious worship"; otherwise the exemption provisions would be violative of the First Amendment. It may very well be that the reasoning of the courts in holding, as they have, that churches (using "religious worship" in the commonly accepted definition as "adoration, or reverence, paid to God") are entitled to exemption because of the use of their properties for other laudable purposes rather than strictly religious purposes, is a very artificial one. Actually, as shown in the majority opinion, some courts have held that the religious aspect is the real reason for the exemption. As said in *Washington Ethical Society* v. *District of Columbia,* vol. LXXXIV, Washington Law Reporter, page 1072, cited in the majority opinion (p. 1082): "Viewing taxation as an important branch of the science of economics, exemption from taxation of religious institutions can be justified by the fact only that religion and religious societies teach people to be good, honest and law abiding, less likely to injure their neighbors, tortiously or contractually, and less apt to violate the criminal laws; and, by reason thereof, of economic value to the community. On any such basis the petitioner would be entitled to the same exemption as afforded a church. But one would have to be naive to believe that the exemption to religious societies was based on any such consideration—that it was logical rather than emotional. The exemption was given to promote religion and the belief in, and the worship of God, and was due to our early religious background. *Holy Trinity Church* v. *United States,* 143 U.S. 465 [12 S.Ct. 511, 36 L.Ed. 226]."

In his dissenting opinion in *McCollum* v. *Board of Education* (1948), 333 U.S. 203 [75 S.Ct. 306, 99 L.Ed. 713, 2 A.L.R. 2d 1338], the case dealing with release of public school pupils during the school day for religious instruction in tax supported public school buildings, Mr. Justice Reed said "It seems clear to me that the 'aid' referred to by the Court in the Everson case could not have been those incidental advantages that religious bodies . . . obtain as a by-product of organized society. *This explains the well-known fact that all churches receive 'aid' from government in the form of freedom from taxation.*" (P. 249; emphasis added.)

In the federal tax system corporations, funds and foundations for religious purposes are exempted from the federal income tax. ([26 U.S.C.A.] Int. Rev. Code, § 501, subd. (c) (3).) Even the fair rental value of a parsonage to a minister

of religion or a rental allowance paid to him is exempt from income tax action. ([26 U.S.C.A.] Int. Rev. Code, § 107, subds. (1) and (2).) Gifts to religious organizations are deductible. ([26 U.S.C.A.] Int. Rev. Code, § 170, subd. (c).)

While Fellowship of Humanity and other philosophical beliefs of similar type are commendable organizations, it must be remembered as was pointed out in the Washington Ethical Society case concerning that society (p. 1083) that the Fellowship, while possibly not actively opposed to the belief in or worship of a Supreme Being, nevertheless discourages such belief. To allow tax exemption to such an organization would be directly contrary to the intent of the adoptors of the tax exemption provisions. Reverence for morality, ethics and right living (no matter how desirable and laudable it may be) is not religious worship.

Congress itself has interpreted the meaning of religion in enacting the Selective Service Act of 1948 (50 U.S.C.A. § 456 (j).) It said: ". . . Religious training and belief in this connection means an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but does not include essentially political, sociological, or philosophical views of a merely personal moral code." Equally significant is the fact that by amendment of June 27, 1952, to the Nationalization Act of 1940 (c. 477, tit. III, ch. 2, § 337, 66 Stats. 258, 8 U.S.C.A. § 1448), a definition of "religious training and belief" identical with the definition of such term in the Selective Service Act of 1948, was adopted.

Again Congress recently added to the oath of allegiance the words "under God." From before the Declaration of Independence, which refers to "the separate and equal station to which . . . nature's God entitle[s]" a people and states that all men "are endowed by their Creator . . ." and ends with "a firm reliance on the protection of Divine Providence," to the present date, history shows that "We are a religious people whose institutions presuppose a Supreme Being." (*Zorach* v. *Clauson*, 343 U.S. 306, 313 [72 S.Ct. 679, 96 L.Ed. 954].)

In view of the historic background of the tax exemption provisions and the generally accepted and time honored definition of the words "religious worship" I cannot accept in that definition the practice of ethical and philosophical principles and ideas, no matter how fervently and sincerely carried on. To do so would open the door to many organizations completely

beyond the intent and purview of the exemption provisions. Most fraternal organizations except for certain limitations could qualify. They have altruistic principles, advocate the brotherhood of man and following the Golden Rule. Of course, the facts that membership is not open to all who might be willing to espouse their beliefs, that their social nature is equally, if not more, important than their altruistic nature, the absolute requirement of payment of initiation fees and dues, and other distinctions, make them ineligible to the exemption.

Nor do I believe that applying the theistic requirements to the definition of "religious worship" constitutes a violation of the First Amendment, and is a law "respecting an establishment of religion, or prohibiting the free exercise thereof . . ." As pointed out in the majority opinion as well as here, this definition has been accepted over the years by the people, Legislatures and the Congress, and although the effect of the First Amendment upon such definition has not directly been passed upon by the United States Supreme Court, as to tax exemption, it has held such definition in other matters not to be violative of the Constitution (even though sometimes by a divided court).

Moreover, tax exemptions of this kind have gone practically unquestioned as to the effect of the First Amendment for nearly a century and a half. See quotation in majority opinion from *Lundberg* v. *County of Alameda,* 46 Cal.2d 644 [298 P.2d 1]. "An examination of court opinions discloses the fact that legislation granting indirect subsidies, in the form of tax exemption, is upheld by the courts, even though a direct subsidy to the same institutions would be denied under the doctrine of direct public purpose. This is amply illustrated in the case of churches . . ." (Minn. L. Rev., vol. 18, at p. 419 (1933-1934).)

During the time that the courts have been upholding tax exemptions to entities engaged in "religious worship" they have assumed or held that the definition of those words meant worship of a Supreme Being.

While of course length of time will not make that constitutional which is unconstitutional, nevertheless time-honored tradition may be important in determining the meaning of a constitutional provision. (See article on *State Tax Exemptions and the Establishment Clause,* Stan. L. Rev. (March, 1957), vol. 9, No. 2, pp. 366-375.)

Concerning my opinion I deem it only fair to say that

the writer of the majority opinion has done a painstaking and excellent work in analyzing the problems involved and the authorities upon the subject. I agree with most of the opinion except only the portion to the effect that to save tax exemption from the First Amendment it is necessary to extend the exemption to philosophical and ethical organizations and not to limit it to "churches" in the generally accepted view of that term.

I therefore would reverse the judgment in Number 17176. I concur in the opinion in Number 17175.

Appellants' petition for a hearing by the Supreme Court in No. 17176 was denied November 5, 1957. Shenk, J., Schauer, J., and Spence, J., were of the opinion that the petition should be granted.